F. Richard Ruderman (SB No. 142226)
rick@rudermanknox.com
Christian M. Knox (SB No. 171780)
christian@rudermanknox.com
**Ruderman & Knox, LLP**
1300 National Drive, Ste. 120
Sacramento, CA 95834
Telephone: (916) 563-0100
Facsimile: (916) 563-0114

Daniel R. Shaw (SB No. 281387)
daniel@shawfirm.com
**Shaw Firm**
3196 S. Higuera St. Suite E
San Luis Obispo, CA 93401
Telephone: (805) 439-4646
Facsimile: (805) 301-8030

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kimiko P., a conserved adult; by and through her conservators Mariko Peshon McGarry, Randolph Peshon, and Teresa Peshon,<br><br>  Plaintiffs,<br><br>  v.<br><br>Alta California Regional Center, On My Own Independent Living Services, Inc., and Placer ARC,<br><br>  Defendants. | Case No.: TBD<br><br>**COMPLAINT FOR RELIEF UNDER:**<br><br>1) **For Violations of Section 504 of the Rehabilitation Act of 1973**<br><br>2) **For Violations of the Americans with Disabilities Act**<br><br>3) **For Negligent Supervision**<br><br>4) **For Retaliation under Section 504**<br><br>5) **For Retaliation under Title II**<br><br>**TRIAL BY COURT REQUESTED** |

///

///

1

## JURISDICTION AND VENUE

1. This is a civil action which this Court has original subject matter pursuant to 28 U.S.C. § 1331 as the actions arise under these laws of the United States:), Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).

2. Venue in this Court is proper under 20 U.S.C. 1391(b) because some of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## DEMAND FOR TRIAL BY COURT

3. Plaintiff hereby demands a trial by court pursuant to Federal Rule of Civil Procedure 38(b).

## PARTIES

4. Plaintiff Kimiko P. ("Kimi") is a young adult with autism, an intellectual disability, and mutiple other diagnoses who has been and continues to be at risk for exploitation by sexual predators. Kimi is eligible for services under the California Lanterman Developmental Disabilities Act ("Lanterman Act"). See Calif. Welf. & Inst. Code § 4500 et al.

5. Defendant Alta California Regional Center ("Alta Regional Center") is a state and federal funded non-profit entity charged with the responsibility of coordinating and developing the supports and services guaranteed by the Lanterman Act. Alta Regional Center is a recipient of federal funds and is also a public entity subjecting them to Title II of the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973.

6. In enacting Title II of the Americans with Disabilities Act, Congress validly abrogated state sovereign immunity, and thus the Alta Regional Center may be sued under Title II. *Hanson v. Med. Bd. Of California*, 279 F.3d 1167, 1170 (9th Cir. 2002). By accepting federal Rehabilitation Act funds, Alta Regional Center waived its sovereign immunity under the Eleventh Amendment to claims brought under Section 504 of the Rehabilitation Act of 1973. *Pugliese v. Dillenberg*, 246 F.3d 937 (9th Cir. 2003).

7. Defendant On My Own Independent Living Services, Inc. ("On My Own") is a supported living service provider. On My Own is contracted by the Alta Regional Center to provide supported living services to individuals served under the Lanterman Act. On My Own is a private entity not subject to state sovereign immunity claims.

8. Defendant Placer ARC is a non-profit entity who also runs an adult day program. Lanterman Act eligible adults attend the Placer ARC day program to increase vocational training, dialing living practices, health and fitness, cognitive growth, and all other aspects of independent living. Placer ARC is contracted with the Alta Regional Center to provide such services. Placer ARC is a private entity not subject to state sovereign immunity claims.

9. At all relevant times set forth herein, all Defendants acted in concert and as the agent of one another.

## BASIS OF THE DISPUTE

10. This case involves the sexual exploitation of Kimi, a developmentally delayed adult, as the result of Defendants' failure to ensure the provision of appropriate supports and services envisioned under the Lanterman Act to keep Kimi safe in the community.

11. The Lanterman Act, passed in 1977, ensured that individuals with developmental disabilities had the right to supports and services to enable them to live more independent lives. The Lanterman Act created a system of twenty-one regional centers mandated to provided eligible individuals with developmental disabilities the necessary supports, services, treatment, and habilitation to ensure meaningful participation in society, protect their safety, and to advocate for their needs. See Calif. Welf. & Inst. Code § 4500 et al.

12. The California Legislator allocates annual funding to each of the twenty-one regional centers to purchase services to ensure the purpose of the Lanterman Act is met. Regional centers can purchase supports and services through contracts with individuals or agencies such as On My Own and Placer ARC. Calif. Welf. & Inst. Code § 4648(a)(3).

///

## FACTUAL ALLEGATIONS

13. Kimi is a twenty-six-year-old conserved adult who qualifies for the protections and safeguards afforded by California's Lanterman Act because Kimi is developmentally disabled. When Kimi was ten-years old she qualified for Lanterman services as an individual with an intellectual disability. Because Kimi resides in Placer County, she is served by Alta Regional Center.

14. As an individual with an intellectual disability, Kimi has deficits in all areas. Despite Kimi's deficits, her communication skills are relatively high compared to her other adaptive skills. Her relatively high communication skills has made her vulnerable to sexual predators. While Kimi has an extensive vocabulary, she does not understand the impact and consequences her words have on others or the danger she places herself in. Cause and effect is a foreign concept to Kimi because of her disabilities.

15. Kimi was a special education student identified with autism, significant learning disabilities, and an intellectual disability. Kimi's individualized education plans focused on her social skill deficits, impulsive behaviors, and seeking out negative attention.

16. In her early teens, Kimi was described as a "complicated examinee with a paradoxical psychometric profile." While Kimi possessed what appeared to be intact language abilities, she lacked the ability to use her language in a developmentally appropriate manner. Kimi would often argue, make inappropriate comments, and make verbal threats. Kimi was described as often unaware of danger, impulsive, seeking sensory input, and lacking an understanding of social boundaries.

17. In her early adult years, Kimi's school district placed her at the Northern California Preparatory School's Independent Living Skills Program in Sacramento, California. The Northern California Preparatory School was a California certified nonpublic school designed for individuals whose needs could not be met on a comprehensive public-school campus. As noted by several psychologists, Kimi's prospect for some degree of independent living was good.

18. When Kimi became an adult, her parents and sister conserved her pursuant to an order by the El Dorado County Superior Court. Kimi's conservatorship is a conservatorship of her person and estate. Kimi's conservators feared that she was the perfect victim for sexual exploitation. Kimi aspired for social acceptance, did not understand social boundaries, and had enough intact language to put herself in dangerous situations.

19. Over the course of 2009, Kimi lived in many Alta Regional Center-provided residential living settings. Kimi was evicted from several residential settings because of her inability to get along with others, verbal aggression, physical aggression, and not respecting personal boundaries. Kimi required 24/7 supervision which was exhausting and tedious for group home staff to provide.

20. While in residential living, during the day Kimi attended day programs funded by Alta Regional Center.

21. In 2014, Kimi was found having sexual relations with another Alta Regional Center consumer while attending A. Warren McClaskey Adult Center. Kimi and the other individual were both incapable of understanding the responsibilities of a sexual relationship or the dangers. Alta Regional Center considered providing Kimi with a one-to-one aide to better supervise her. This idea was abandoned when the day program opined that Kimi would have to leave that setting if she required a one-to-one aide because that would indicate she required a higher level of care. Ultimately, Kimi was removed from the day program because she required more supervision than could be provided.

22. It became obvious that Kimi required constant adult supervision, was seeking inappropriate sexual relationships, and was in danger of sexual exploitation. This was very concerning to Kimi's conservators because she was incapable of understanding the danger she put herself in.

23. In 2014, Kimi figured out how to use the internet to access online sites aimed at providing companionship. Alta Regional Center knew this was a problem and a concern of Kimi's

5

conservators.

24. In late 2014, Kimi accessed the internet and created a Facebook profile.

25. In September of 2015, on Facebook, Kimi met an adult man named Eric. Kimi explained to Eric she lived in a group home, that she could not leave without an adult, and that she was conserved. Kimi asked Eric to kidnap her from out front of her group home while she was getting the mail and sexually torture her in his car. Kimi did not understand the danger she was putting herself in. On February 21, 2015, around 1:00 a.m., Kimi snuck out of her house to meet Eric. Once outside of her house, Kimi expressed she was scared and asked Eric to come to her. Kimi eventually made it to Eric's car where she was sexually exploited. Kimi was sexually exploited much like an adult takes advantage of a young child.

26. Eric and Kimi continued to talk on Facebook. Eric demanded that Kimi call him "master" while he called her "slave." Kimi explained to Eric she had autism, was conserved, lived in a group home, could not leave without adult supervision, and was not supposed to access Facebook because others believed it was unsafe for her. Eric instructed Kimi to watch porn videos to learn to perform better oral sex.

27. In 2015, Kimi also began to participate in the Placer ARC day program. Placer ARC knew of Kimi's dangerous internet use and represented they would provide her with one-to-one supervision when she accessed the internet. While at the Placer ARC day program, covering the period of time captured in this complaint, Kimi was able to create mutiple Facebook pages unsupervised. All of Kimi's Facebook pages showed Placer ARC being a "friend."

28. In September of 2015, Kimi was again not being appropriately supervised and snuck out of her group home. Kimi was again picked up by Eric who sexually exploited her. This was immediately reported to Alta Regional Center. Based on information and belief, many of the conversations between Kimi and Erik took place via Facebook at the Placer ARC day program.

6

29. In December of 2015, Alta Regional Center drafted a supported living services consumer profile for Kimi. The profile noted that an alarm would be placed in Kimi's home to notify an adult if Kimi attempted to leave. It took Alta Regional Center two years to provide the alarms.

30. In May of 2016, Placer ARC reported to Alta Regional Center that Kimi was accessing the internet for inappropriate purposes. Kimi would not have accessed the internet inappropriately if she was being provided the one-to-one supervision she required. Placer ARC reported that Kimi was accessing inappropriate internet sites in their computer room and that it would be addressed. Placer ARC and Alta Regional Center knew of Kimi's dangerous internet behavior and were not providing appropriate supervision.

31. In mid-2016, Kimi was again evicted from her Family Home Agency placement because of her behaviors. Kimi's conservators decided it would be best for her to live in her own apartment with around-the-clock supervision via a supported living services provider. Kimi's conservators hoped that by not living with multiple roommates, more time could be spent focusing on her social/emotional development. Kimi was evicted so often she was deprived of a stable living situation necessary to help foster development in her core deficits areas. Kimi's mobility undermined her ability to benefit from Lanterman Act services.

32. On July 8, 2016, Alta Regional Center convened an Individual Program Planning meeting to discuss Kimi's move to her own apartment. Kimi's conservators requested that Kimi have no access to the internet, requested constant supervision to protect her health and safety, and training to address Kimi's poor insight and attempts to seek inappropriate companionship. Alta Regional Center opined that Kimi should be supervised in the community and at home. Kimi's conservators requested that Alta Regional Center coordinate alarms being placed on the windows and doors of her apartment. Alta Regional Center did nothing regarding the requested alarms.

33. Alta Regional Center moved another Lanterman Act eligible individual into Kimi's

7

apartment. This individual was higher functioning than Kimi and setup the internet in their shared apartment. Alta Regional Center should have never moved in another individual who required the use of the internet.

34. In July of 2016, supported living services provider On My Own began to provide in-home support to Kimi. On My Own knew of Kimi's history as described herein, and that she could not be on the internet unsupervised. As part of the supported living services process, a support plan was developed. The plan noted that if Kimi eloped from her apartment the staff would call her family, so they may attempt to intervene. However, On My Own failed to develop a support plan to ensure Kimi was not accessing the internet or that staff were appropriately trained to respond to Kimi if she tried to leave the apartment.

35. During the evenings, Alta Regional Center provided Kimi and her roommate with one overnight staff person through On My Own. This staff person was primarily placed in the apartment for Kimi because Kimi's roommate was higher functioning and did not require constant supervision.

36. In September of 2016, Kimi's services coordinator from Alta Regional Center opined in writing that Kimi was "was very much in need" of one-to-one staffing and that shared staffing (between Kimi and her roommate) was not adequate. Kimi's conservators were also requesting one-to-one staffing to keep Kimi safe. Alta Regional Center made no such changes to Kimi's supports and services.

37. On November 18, 2016, Kimi's conservators notified Alta Regional Center and On My Own that Kimi had accessed inappropriate websites on the internet and that she should never be on the internet. Alta Regional Center wrote to On My Own this was a "significant safety issue" and that they should develop a mitigation plan to ensure staff working with Kimi understood their obligation to keep her safe. No such plan was ever developed.

38. During this time period, Kimi continued to attend the Placer ARC day program. Based on information and belief, Kimi continued to have unsupervised access to the internet where

|   |   |   |
|---|---|---|
| 1 |     | she developed a profile on OKCupid—a dating website. |
| 2 | 39. | On February 4, 2017, in the early evening, Kimi had a conversation with an adult male via OKCupid. Kimi explained that she had special needs and provided her phone number and address, so the man could pick her up. |
| 5 | 40. | On February 5, 2017, at approximately 1:30 a.m., Kimi attempted to leave her apartment to meet the man. The supported living service staff member from On My Own intervened with Kimi who stated she was going to meet a man. Instead of following Kimi out the door which would have prevented the subsequent sexual exploitation of Kimi, the staff person remained in the home. The staff person did not immediately contact the police or Kimi's conservators. Instead, the staff person contacted her supervisor who told her to contact the police. The staff person then called the non-emergency police line. As a result, the police did not arrive until approximately 2:37 a.m. By that time, the man had drawn Kimi into his car and had sex with her in the parking lot. |
| 14 | 41. | Because of the incidents described herein, Kimi is at an even greater risk for continued sexual exploitation. Kimi has a warped sense of relationships and lacks the insight to understand the dangerousness of her behavior. Kimi's warped sense of relationships has been reinforced through her sexual exploitation. |
| 18 | 42. | After the February 2017 incident, Kimi's conservators began to strongly advocate for her safety including ensuring she had adequate around-the-clock supervision. Because of their advocacy, On My Own retaliated against Kimi and her conservators and provided notice they were terminating their services. The notice was provided only a few weeks after Kimi was sexually exploited. |
| 23 | 43. | Initially, Placer ARC took no adverse action against Kimi. In November of 2017, Kimi's conservator and attorneys requested that she have a one-to-one with her while she attended the Placer ARC program to ensure she was not accessing the internet and to help deal with her behavioral issues. Placer ARC opined in a recorded meeting that Kimi did not require one-to-one support. Placer ARC was aware Kimi's conservators had hired |

9

attorneys to address Kimi's sexual exploitation.

44. On November 28, 2017, Placer ARC discharged Kimi from their day program allegedly because of her continued attempts to access the internet and her need for one-to-one supervision. Placer ARC specifically noted that Kimi's behaviors were too severe for their program despite just stating her needs could be met *without* the assistance of a one-to-one support person. Placer ARC discharged Kimi from the day program because her conservators were advocating for her rights and considering taking legal action. Kimi's removal from Placer ARC was done purely to retaliate against her.

45. For many months after the February 2016 incident, Alta Regional Center refused to provide Kimi with the supports and services she requires under Lanterman Act.

46. Alta Regional Center engaged in retaliation against Kimi. Alta Regional Center is supposed to provide service coordination to individuals like Kimi. See Calif. Welf. & Inst. Code § 4620(a). However, Alta Regional Center often refused to provide service coordination for Kimi by forcing that responsibility on Kimi's conservators. In 2017, when On My Own refused to continue to provide Kimi with supported living services, Alta Regional Center sent Kimi's conservator a list of over a dozen providers and instructed them to find one that would accept Kimi. Alta Regional Center knew or should have known that none of the proposed providers had openings[1]. Nonetheless, Kimi's conservators had to contact every entity. When they could not find an opening, Alta Regional Center blamed the family for their advocacy and attempted to strong-arm Kimi into a group home setting which she had previously failed in.

47. Eventually, Kimi's conservators found a company called California CareGivers. California CareGivers provided personal assistant hours to individuals like Kimi. While Kimi required supported living services, in the interim, it was agreed that California CareGivers could provide personal assistant hours to allow Kimi to be supervised. California CareGivers also applied to become an Alta Regional Center vendor for

---

[1] In 2017, in Claimant vs. Alta Regional Center the services agency (Alta Regional Center) admitted there were no openings for supported living service programs. OAH Case No. 2017080892

10

supported living to help meet Kimi's needs.

48. Kimi's conservators requested that California CareGivers be provided an emergency vendorization under California Code of Regulations, Title 17, section 54324. This would have allowed California CareGivers to immediately begin to provide supported living services to Kimi while they finalized a program design and contracted with Alta Regional Center. Alta Regional Center refused to do this.

49. California CareGivers provided a program design to Alta Regional Center to become a supported living service provider in June 2017. To date, their program has not been approved. Based on information and belief, Alta Regional Center is intentionally delaying the vendorization of California CareGivers in retaliation for conservators' advocacy on behalf of Kimi.

50. Alta California Regional Center has continuously delayed approval of California CareGiver's application to become a supported living service provider by creating hurdles for California CareGivers that are outside of the vendorization process. Alta California Regional Center maintains a paucity of vendored supported living service providers which have limited openings. Rather than securing more options for consumers like Kimi by soliciting and promoting supported living provider applications, Alta California Regional Center has engaged in a policy and practice of limiting the availability of supported living service providers.

51. The Alta Regional Center's conduct described herein constitutes intentional discrimination against Kimi on account of her disability in that the Alta Regional Center knew or should have known that their actions or inactions were substantially likely to harm Kimi's federally protected rights but failed to act upon that likelihood by persisting in taking positions it knew were unlawful and discriminatory.

52. As a direct and proximate result of the acts and omissions alleged in this Complaint, Kimi has suffered substantial developmental losses, causing a decline in her future development, which adversely affects her future earnings and earning potential, and which

1    has resulted in humiliation, pain, suffering, and damage to her social development and interpersonal relations, in an amount subject to proof.

# FIRST CLAIM FOR RELIEF

*Violation of § 504 of the Rehabilitation Act of 1973*

**(Defendant, Alta Regional Center)**

53. Plaintiff refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

54. Plaintiff is informed and believes, and on that basis alleges, that the Alta Regional Center is, and at all relevant times, was a recipient of federal funds, and that part of those funds were used in the operations, construction and/or maintenance of the specific public facilities and programs described herein and the activities that take place therein.

55. Kimi is a qualified individual with a disability. Kimi has an intellectual disability and autism which substantially limits all major life activities.

56. By its actions or inactions in denying equal access to appropriate support and services, the Alta Regional Center discriminated against Kimi by failing to provide appropriate supports and services based on Kimi's unique needs. The lack of appropriate supports and services led to the incidents described herein, which was clearly foreseeable in light of Kimi's behavioral history and past risk for sexual exploitation. As a result, the Alta Regional Center violated Kimi's rights under Section 504 of the Rehabilitation Act of 1973.

57. Furthermore, the Alta Regional Center violated Section 504 of the Rehabilitation Act of 1973 by failing to afford Kimi an equal opportunity to participate in or benefit from the aid, benefit, and services provided by Alta Regional Center in violation of 34 C.F.R. § 104.4. As a result, the Alta Regional Center violated Kimi's rights under Section 504 of the Rehabilitation Act of 1973.

///

58. The discrimination described herein constitutes a violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 749, et seq.), which provides that "no otherwise qualified individual with a disability shall, solely be the reason of his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

59. The Alta Regional Center acted with deliberate indifference to Kimi's rights under Section 504, as described herein, by knowingly failing to provide Kimi the supports and services she required to benefit. Moreover, Kimi's required supports and services were clearly obvious.

60. Furthermore, the Alta Regional Center has retaliated against Kimi and her conservators in violation of Section 504.

61. As a direct and proximate result of the District's discrimination, Kimi suffered damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

*Violation of the Americans With Disabilities Act*

**(Defendant, Alta Regional Center)**

62. Plaintiff refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

63. At all relevant times, Kimi was entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990 ("Title II"). Title II, Subpart A prohibits discrimination by any "public entity", including any state or local government, as defined by 42 U.S.C. § 12131, section 201 of the ADA. Alta Regional Center is a "public entity" and subject to Title II.

64. Pursuant to 42 U.S.C. § 12132, section 202 of Title II, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity. Kimi was at all times relevant herein a

13

1  qualified individual with a disability as defined herein.

2  65. By its actions or inactions in denying equal access to Lanterman Act services, the Alta Regional Center discriminated against Kimi by failing to provide her with appropriate supports and services. The lack of appropriate supports and services caused Kimi to be sexual exploited and led to the incidents described herein which were clearly foreseeable in light of Kimi's behavioral history.

66. The Alta Regional Center acted with deliberate indifference to Kimi's rights under Title II, as described herein, by knowingly failing to provide Kimi the supports and services she required to benefit. Moreover, Kimi's required supports and services were clearly obvious.

67. Furthermore, the Alta Regional Center has retaliated against Kimi and her conservators in violation of Title II.

68. As a result of the Alta Regional Center's failure to comply with its duty under Title II, Kimi has suffered damages including special and general damages according to proof.

## THIRD CLAIM FOR RELIEF

*Negligent Supervision*

**(Defendants, On My Own and Placer ARC)**

69. Plaintiff refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

70. At all times herein mentioned, On My Own and Placer ARC, inclusive, and each of them, owed a duty to Kimi, to exercise reasonable care in connection with the evaluation, hiring, employment, training, supervision, and retention of personnel in addition to ensuring that Kimi was safe.

71. At all times herein mentioned, On My Own and Placer ARC, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that their negligent conduct was likely to injure Kimi. Moreover, the On My Own and Placer ARC, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that

|   |   |   |
|---|---|---|
| 1 |   | Placer ACR and On My Own staff working with Kimi were not properly trained in |
| 2 |   | keeping Kimi safe. |
| 3 | 72. | On My Own and Placer ARC, and each of them, negligently supervised the care of Kimi |
| 4 |   | as alleged herein. |
| 5 | 73. | On My Own and Placer ARC breached its duty of care owed to Kimi by, among other |
| 6 |   | things, failing to exercise reasonable care in the evaluation, hiring, employment, training, |
| 7 |   | supervision, and retention of staff, supervision of Kimi, and failing to ensure Kimi was |
| 8 |   | safe while receiving Lanterman Act services. |
| 9 | 74. | Plaintiff is informed and, on that basis, alleges that On My Own and Placer ARC knew or |
| 10 |   | should have known that the supervision of Kimi was negligent and careless.  On My Own |
| 11 |   | and Placer ARC failed to properly screen, train, and/or supervise staff working with Kimi |
| 12 |   | and such a failed amounted to a breach of the duty of care owed to Kimi. |
| 13 | 75. | As the direct and proximate result of On My Own and Placer ARC's conduct, inclusive, |
| 14 |   | and each of them, has caused Kimi serious and severe injuries in an amount to be proven |
| 15 |   | at trial. |
| 16 | 76. | As the direct and proximate result of the said negligence and carelessness of On My Own |
| 17 |   | and Placer ARC, and each of them, Kimi has suffered severe emotional distress, trauma, |
| 18 |   | embarrassment, severe mental anguish, shock and trauma.  Plaintiff has suffered, and for a |
| 19 |   | long period of time to come will continue to suffer said pain and mental anguish. |
| 20 | 77. | In addition, On My Own and Placer ARC knew that Kimi had a right be to safe in her |
| 21 |   | community with the appropriate supports.  Notwithstanding this knowledge, On My Own |
| 22 |   | and Placer ARC, in willful and conscious disregard of Plaintiff's right to be safe, failed to |
| 23 |   | take any appropriate action to prevent the aforementioned.  Thus, Kimi is entitled to an |
| 24 |   | award of exemplary and punitive damages against On My Own and Placer ARC. |
| 25 | /// |   |
| 26 | /// |   |
| 27 | /// |   |
| 28 |   |   |

## FOURTH CLAIM FOR RELIEF

*Retaliation Under Section 504 of the Rehabilitation Act of 1973*

**(Defendants, On My Own, Placer ARC, and Alta Regional Center)**

78. Plaintiffs refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

79. The Defendants are direct recipients of federal financial assistance sufficient to invoke the coverage of Section 504.

80. Kimi is a qualified individual with a disability as recognized by Section 504. Kimi has an intellectual disability and autism which substantially limits all major life activities.

81. Kimi's conservators engaged in a protected activity when they attempted to advocate for her wellbeing and safety as discussed herein.

82. The Defendants were aware of Kimi's conservator's advocacy as discussed herein.

83. The Defendants retaliatory conduct constitutes a violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 749, et seq.). Section 504 of the Rehabilitation Act of 1973 incorporates the antiretaliation provision of Title VI of the Civil Rights Act of 1964 which providers that "no recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act of this part, or because he had made a complaint, testifies, assisted, or participated in any manner in an investigation, proceeding, or hearing under this part."

84. As the direct and proximate cause of the Defendant's retaliatory conduct, plaintiff (Kimi and her conservators) suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

*Retaliation Under Title II of the Americans with Disabilities Act*

**(Defendants, On My Own, Placer ARC, and Alta Regional Center)**

85. Plaintiffs refers to, and incorporates herein by reference, all of the preceding paragraphs as though fully set forth herein.

16

86. The Defendants are direct recipients of federal financial assistance sufficient to invoke the coverage of Title II of the Americans with Disabilities Act ("ADA").
87. Kimi is a qualified individual with a disability as recognized by Title II of the ADA. Kimi has an intellectual disability and autism which substantially limits all major life activities.
88. Kimi's conservators engaged in a protected activity when they attempted to advocate for her wellbeing and safety as discussed herein.
89. The Defendants were aware of Kimi's conservator's advocacy as discussed herein.
90. The Defendants retaliatory conduct constitutes a violation of Title II of the ADA. Title II of the ADA, part 42 U.S.C. § 12132 (a), provides that "no private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under the Act or this part." Title II of the ADA, part 42 U.S.C. § 12132 (b), provides that "no private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise of enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise of enjoyment, of any right granted or protected by the Act or this part."
91. As the direct and proximate cause of the Defendant's retaliatory conduct, plaintiff (Kimi and her conservators) suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

92. Compensatory damages for Kimi's injury, psychological and emotional distress, and for any other damages as alleged herein in a sum according to proof;
93. Compensatory damages for Kimi's conservators in a sum according to proof;
94. Special damages in a sum according to proof against all Defendants;
95. General damages in a sum according to proof against all Defendants;
96. Injunctive relief in accordance with proof;
97. Attorneys' fees and costs of suit incurred herein; and

17

98. For such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: January 9, 2019

/S/ F. RICHARD RUDERMAN
F. Richard Ruderman
Attorney for Plaintiff